Rosemary M. Rivas (SBN 209147)
rrivas@zlk.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JOSEPH TOLA, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

UCP, INC., MICHAEL C. CORTNEY, DUSTIN L. BOGUE, ERIC H. SPERON, PETER H. LORI, KATHLEEN R. WADE, MAXIM C.W. WEBB, CENTURY COMMUNITIES, INC., and CASA ACQUISITION CORP.,

Defendants.

Case No. 5:17-cv-02713

CLASS ACTION

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

JURY TRIAL DEMANDED

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

**SUMMARY OF THE ACTION**

1. This is a class action brought on behalf of the public stockholders of UCP, Inc. ("UCP" or the "Company") against UCP and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on April 11, 2017 (the "Proposed Transaction"), pursuant to which UCP will be acquired by Century Communities, Inc.

("Parent") through its wholly-owned subsidiary, Casa Acquisition Corp. ("Merger Sub," and collectively with Parent, "Century").

2. On April 10, 2017, the Board caused UCP to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of UCP will receive $5.32 in cash and 0.2309 of a share in the newly combined company for each share they own.

3. On May 5, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of UCP common stock.

9. Defendant UCP is a Delaware corporation and maintains its principal executive

offices at 99 Almaden Boulevard, Suite 400, San Jose, California 95113. The Company is a homebuilder and land developer. UCP's common stock is traded on the New York Stock Exchange under the ticker symbol "UCP."

10. Defendant Michael C. Cortney ("Cortney") is a director and Chairman of the Board of UCP. According to the Company's website, Cortney is Chair of the Compensation Committee, a member of the Audit Committee, and a member of the Nominating and Corporate Governance Committee.

11. Defendant Dustin L. Bogue ("Bogue") is a director, President, and Chief Executive Officer ("CEO") of UCP.

12. Defendant Eric H. Speron ("Speron") is a director of UCP.

13. Defendant Peter H. Lori ("Lori") is a director of UCP. According to the Company's website, Lori is Chair of the Audit Committee and a member of the Compensation Committee.

14. Defendant Kathleen R. Wade ("Wade") has served as a director of UCP since April 2014. According to the Company's website, Wade is Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

15. Defendant Maxim C.W. Webb ("Webb") has served as a director of UCP since 2007. According to the Company's website, Webb is a member of the Nominating and Corporate Governance Committee.

16. The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17. Defendant Parent is a Delaware corporation with its principal executive offices located at 8390 East Crescent Parkway, Suite 650, Greenwood Village, Colorado 80111.

18. Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

**CLASS ACTION ALLEGATIONS**

19. Plaintiff brings this action as a class action on behalf of himself and the other

public stockholders of UCP (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20. This action is properly maintainable as a class action.

21. The Class is so numerous that joinder of all members is impracticable. As of March 31, 2017, there were approximately 7,958,314 shares of UCP common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22. Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company and the Proposed Transaction

26. UCP is a homebuilder and land developer with expertise in residential land acquisition, entitlement, and development, as well as home design, construction, and sales.

27. The Company operates in California, Washington, North Carolina, South Carolina, and Tennessee.

28. UCP designs and builds single-family homes for a variety of lifestyles and budgets through its wholly-owned subsidiary, Benchmark Communities, LLC. The Benchmark Communities brand is recognized by homebuyers for its high-quality construction and craftsmanship, cutting-edge home design, and customer-centric service and warranty programs.

29. On February 27, 2017, the Company issued a press release wherein it reported its fourth quarter and full year 2016 results.

30. For the fourth quarter, the Company reported that earnings increased to $0.89 per share of Class A common stock; revenue from homebuilding operations increased 17.5% to $104.4 million; homes delivered increased 15.2% to 257; and net new home orders increased 26.1% to 232 units compared to the fourth quarter of 2015.

31. For the full year 2016, UCP reported that earnings increased to $1.15 per share of Class A common stock; revenue from homebuilding operations increased 36.2% to $343.9 million; homes delivered improved 17.0% to 820 units; and net new home orders increased 8.5% to 933 units.

32. With respect to the financial results, Individual Defendant Bogue, President and CEO of the Company, commented:

> We are pleased to achieve record earnings for the full year 2016 as a result of sustained revenue momentum, operating discipline and a transformative approach to generating stronger profitability. During the year, our efforts to design innovative homes and uphold best in class construction standards allowed us grow homebuilding revenues and improve homebuilding gross margin, despite inflationary increases in material and labor costs. In the fourth quarter, the West division continued to be the main driver of growth, with home deliveries growing 22.8% and net new home orders growing 31.7%, on the strength of demand from our first-time and move down home buyer. In the Southeast, fourth quarter net new home orders grew for the second consecutive quarter. Overall, our West and Southeast markets continue to demonstrate healthy housing fundamentals with year-end backlog up 45.4% to 362 units. As we look to 2017 and beyond, we are committed to growing earnings through a sustainable pipeline of well-located communities to drive high-quality orders at attractive margins. We plan to accomplish this while improving balance sheet metrics, extending our debt maturities and maintaining an effective land strategy to improve returns on equity.

33. Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

34. To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Century and are calculated to unreasonably dissuade potential suitors from making competing offers.

35. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Sections 5.02(a) and (b) of the Merger Agreement state:

> (a) Termination of Existing Discussions. The Company, each of the Company Subsidiaries, and the respective directors, officers, employees and controlled Affiliates of the Company and of each of the Company Subsidiaries shall, and the Company shall instruct each of its Representatives to, cease immediately and cause to be immediately terminated all soliciting activities, discussions and negotiations and access to nonpublic information with, to or by any Person (other than Parent or Merger Sub) regarding any proposal, expression of interest, request for information or other communication that constitutes, or could reasonably be expected to lead to, any Company Takeover Proposal. The Company shall promptly (but not later than one (1) Business Day after the first public announcement of this Agreement) request that each Person (other than Parent and Merger Sub) with which or whom the Company heretofore has entered into a confidentiality, standstill or similar agreement or otherwise has had discussions or negotiations, in each case, regarding any offer, proposal, expression of interest, request for information or other communication that constitutes, constituted, or reasonably could be expected to lead to, any Company Takeover Proposal (any such Persons and their Affiliates and Representatives being referred to as "Prior Company Bidders"), that is in possession of, or was furnished with or provided access to, any Company nonpublic information, immediately return to the Company or destroy (with a certification of such destruction delivered to the Company if such a certification is required by such confidentiality, standstill or similar agreement, or with the Company requesting a certification of such destruction delivered to the Company if such a certification is not required by such confidentiality, standstill or similar agreement) all such nonpublic information, and, to the extent not heretofore terminated, the Company and its Representatives shall immediately terminate all physical and electronic data room access previously granted to any such Prior Company Bidder.
>
> (b) Prohibition on Soliciting Activities. Except as expressly permitted by this Section 5.02, from the date hereof until the earlier of the Effective Time and the termination of this Agreement in accordance with Article VIII, the Company shall not, nor shall it authorize any of its Representatives or permit any of its controlled Affiliates to, and the Company shall instruct each of its Representatives

> not to, on behalf of the Company, directly or indirectly, (i) solicit, initiate, or knowingly encourage or facilitate any inquiries or the making, announcement or submission to the Company of any expression of interest, proposal or offer that constitutes, or reasonably would be expected to lead to, any Company Takeover Proposal, (ii) enter into any agreement (whether binding, non-binding, conditional or otherwise) with respect to any Company Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into in compliance with Section 5.02(c) ), (iii) other than with respect to Parent, Merger Sub, the Confidentiality Agreement and the Standstill Agreements, fail to enforce, release any Person from, terminate or waive or render inapplicable, or amend in any manner less favorable to the Company, the provisions of any confidentiality, standstill or other similar agreement currently in effect to which the Company or any of the Company Subsidiaries is a party, with respect to a Company Takeover Proposal, (iv) "opt out" of, waive or amend, or take any action to render inapplicable to any Person (other than Parent and Merger Sub) or to any Company Takeover Proposal (other than the Merger and the other Transactions), the provisions of any Anti-Takeover Laws or of Article XII of the Company Charter, or (v) engage in, continue, or participate in any discussions or negotiations with, or furnish any non-public Company information (whether orally or in writing) or access to the business, properties, assets, liabilities, books or records of the Company or any Company Subsidiary to, or otherwise knowingly cooperate with, assist, or participate in any effort by, any Person (or any Representative of any Person) that has made, is seeking to make, has informed the Company or any of its controlled Affiliates of any intention to make, or has publicly announced an intention to make, any proposal that constitutes, or reasonably would be expected to lead to, any Company Takeover Proposal. The Company shall be responsible for any action or inaction taken or omitted to be taken by its or its controlled Affiliates' Representatives, to the extent acting on its or their behalf or at its or their direction, relating to any matters contemplated by this Section 5.02(b).

36. Further, the Company must promptly advise Century of any proposals or inquiries received from other parties. Section 5.02(f) of the Merger Agreement states:

> (f) Required Notices. At any time prior to obtaining the Company Stockholder Approval, the Company shall notify Parent or its Representatives in writing promptly (and in any case within one (1) Business Day after knowledge of Parent of the receipt thereof) of its or any of its controlled Affiliates' receipt of any Company Takeover Proposal, and disclose to Parent the identity of the Person making any such Company Takeover Proposal and the material terms of any such Company Takeover Proposal. The Company shall keep Parent informed on a reasonably timely basis of the status of any such Company Takeover Proposal, including any change to the material terms thereof. The terms and existence of any such Company Takeover Proposal and the identity of such Person (if not publicly disclosed by the Company or such Person), shall be subject to the confidentiality obligations imposed on Parent pursuant to the Confidentiality Agreement.

37. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Century a "matching right" with respect to any

"Superior Proposal" made to the Company. Section 5.02(e) of the Merger Agreement provides:

> (e) Change in Recommendation Permitted in Certain Circumstances. Prior to obtaining the Company Stockholder Approval, the Company Board shall be permitted to make a Company Recommendation Change solely in the manner and to the extent hereafter expressly set forth in this Section 5.02(e) in response to either (i) a Company Superior Proposal that did not result from a violation in any material respect of this Section 5.02, or (ii) a Company Intervening Event, in each case only if the Company Board shall have determined in good faith, After Consultation, that a failure to do so would be inconsistent with the fiduciary duties of the Company Board under applicable Law. Notwithstanding any other provision of this Agreement, at no time shall the Company Board be permitted to make a Company Recommendation Change, unless: (A) the Company has given Parent at least four (4) Business Days' prior written notice that the Company Board intends to make a Company Recommendation Change (a "Company Recommendation Change Notice"), which notice shall include, (1) if Company Recommendation Change is to be made in response to a Superior Company Proposal, the identity of the Person making the Superior Company Proposal, the material terms thereof and a true and complete copy of the proposed agreement or proposal with respect to such Superior Company Proposal (including all proposed material transaction documents in connection therewith and material exhibits and schedules, but redacting, if required by any financing source, the amount of any commitment fee and financing fee information), or (2) if the Company Recommendation Change is to be made in respect of a Company Intervening Event, a reasonable summary of the material underlying facts, conditions and circumstances giving rise to the occurrence and continuing existence of such Company Intervening Event, (B) during the four (4) Business Day period commencing on the date of receipt by Parent of the Company Recommendation Change Notice, the Company and its Representatives shall negotiate in good faith with Parent and its Representatives, to the extent Parent desires to negotiate, so that Parent may propose in writing a binding offer to make such adjustments to the terms and conditions of this Agreement to enable the Company Board to determine that (x) the Superior Company Proposal referred to in the Company Recommendation Change Notice no longer constitutes a Superior Company Proposal or (y) the failure to make a Company Recommendation Change in respect of the Company Intervening Event referred to in the Company Recommendation Change Notice would no longer be inconsistent with the fiduciary duties of the Company Board under applicable Law, and (C) at the end of such four (4) Business Day period, the Company Board shall have considered in good faith and given effect to the terms of such binding offer and shall have determined in good faith, After Consultation, that, (x) the Superior Company Proposal, referred to in the Company Recommendation Change Notice, continues to constitute a Superior Company Proposal or (y) the failure of the Company Board to make a Company Recommendation Change in respect of the Company Intervening Event referred to in the Company Recommendation Change Notice would continue to be inconsistent with the Company Board's fiduciary duties under applicable Law (it being hereby acknowledged and agreed that that any proposed amendment or modification to the material terms of any Superior Company Proposal submitted to the Company by any Person who previously submitted to the Company a Superior Company Proposal shall require a new written notice to Parent from the Company and a three (3) Business Day notice and negotiation period shall thereupon commence anew under this Section 5.02(e)). For purposes of clarification and certainty, under no circumstances shall the Company be permitted to terminate this Agreement in respect of a Superior Company Proposal unless it shall have concurrently complied in all respects with

> the requirements of this Section 5.02(e) and Section 8.01(f) (Termination by the Company before Receipt of Company Stockholder Approval), and under no circumstances shall the Company be permitted to terminate this Agreement in respect of, or due to any Company Recommendation Change made by the Company Board solely in response to, a Company Intervening Event. The Company hereby expressly confirms and agrees that the immediately preceding sentence of this Section 5.02(e), to the extent it relates to a Company Recommendation Change solely in response to or in respect of a Company Intervening Event, has been agreed to by the parties hereto pursuant to Section 146 of the DGCL.

38. Further locking up control of the Company in favor of Century, the Merger Agreement provides for a "termination fee" of $7,050,000, payable by the Company to Century if the Individual Defendants cause the Company to terminate the Merger Agreement.

39. By agreeing to the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

40. Additionally, Century, PICO Holdings, Inc.[1] ("PICO"), which is the Company's majority stockholder, the Company, and UCP, LLC entered into a voting support agreement (the "Voting Agreement"). Pursuant to the terms of the Voting Agreement, PICO has agreed to vote all of its outstanding shares of Company common stock and Class B common stock in favor of the Proposed Transaction, which amounts to 57% of UCP's outstanding voting power. Accordingly, these shares are already locked up in favor of the merger.

41. The merger consideration, valued at $11.37 per share, is inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

42. The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

---

[1] The Proposed Transaction is subject to the consummation of the exchange by PICO of all of its Series A units of UCP, LLC for shares of Company common stock pursuant to and in accordance with the terms of an exchange agreement dated July 23, 2013 among the Company, UCP, LLC, and PICO, with UCP, LLC thereafter becoming a wholly-owned subsidiary of the Company.

43. The analyses performed by the Company's own financial advisor, Citigroup Global Markets Inc. ("Citi"), confirm the inadequacy of the merger consideration. For example, Citi's *Selected Precedent Transactions Analysis* yielded implied per share equity values as high as $14.40.

44. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

45. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

46. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

47. First, the Registration Statement omits material information regarding the Company's financial projections, Century's financial projections, and the analyses performed by the Company's financial advisor, Citi.

48. With respect to UCP's financial projections, the Registration Statement fails to disclose, *inter alia*: (i) unlevered free cash flow and its constituent line items; (ii) EBITDA; (iii) net income; (iv) taxes; (v) depreciation and amortization; (vi) capital expenditures; (vii) changes in net working capital; (viii) stock-based compensation; (ix) operating and other expenses; and (x) net operating losses.

49. With respect to Century's financial projections, the Registration Statement fails to disclose, *inter alia*: (i) unlevered free cash flow and its constituent line items; (ii) EBITDA; (iii) net income; (iv) taxes; (v) depreciation and amortization; (vi) capital expenditures; (vii) changes in net working capital; (viii) stock-based compensation; (ix) operating and other expenses; and (x) net operating losses.

50. With respect to Citi's *Discounted Cash Flow Analysis* for UCP, the Registration Statement fails to disclose: (i) the unlevered, after-tax free cash flows that UCP was forecasted to

generate during the last nine months of the fiscal year ending December 31, 2017 through the full fiscal year ending December 31, 2021 as used by Citi in the analysis; (ii) the definition of unlevered free cash flow; (iii) the constituent line items used in calculating unlevered free cash flow; (iv) the estimated present value of the deferred tax assets of UCP expected by UCP management to be utilized by the Company; (v) the implied terminal value of UCP; (vi) the estimated real estate inventory; (vii) the capitalized interest at the end of the projection period; and (viii) Citi's basis for selecting a range of adjusted real estate inventory multiples of 0.95x to 1.05x and a range of discount rates of 10.1% to 11.5%.

51. With respect to Citi's *Discounted Cash Flow Analysis* for Century, the Registration Statement fails to disclose: (i) the unlevered, after-tax free cash flows that Century was forecasted to generate during the last nine months of the fiscal year ending December 31, 2017 through the full fiscal year ending December 31, 2021 as used by Citi in the analysis; (ii) the definition of unlevered free cash flow; (iii) the constituent line items used in calculating unlevered free cash flow; (iv) the implied terminal value of Century; (v) the estimated adjusted real estate inventory; and (vi) Citi's basis for selecting a range of adjusted real estate inventory multiples of 1.00x to 1.20x and a range of discount rates of 7.0% to 8.0%.

52. With respect to Citi's *Selected Public Companies Analyses*, the Registration Statement fails to disclose the individual multiples and financial metrics for the companies observed by Citi in the analyses.

53. With respect to Citi's *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Citi in the analysis. This information is particularly material here, as the selected transactions go back as far as 1999.

54. With respect to Citi's analysis of premiums paid, the Registration Statement fails to disclose the selected transactions observed by Citi and the premiums paid in those transactions.

55. The disclosure of projected financial information is material because it provides

stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

56. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "UCP's Reasons for the Merger; Recommendation of the UCP Board of Directors"; (iii) "Century Communities Unaudited Prospective Financial Information"; (iv) "UCP Unaudited Prospective Financial Information"; and (v) "Opinion of UCP's Financial Advisor."

57. Second, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors and Citi.

58. Specifically, the Registration Statement fails to disclose when Century first expressed its interest in retaining members of UCP management following a merger (which apparently took place prior to March 13, 2017) and the nature of such expression of interest, as well as the timing and nature of any subsequent communications regarding future employment and/or directorship of UCP's officers and directors, including who participated in all such communications.

59. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

60. The Registration Statement further fails to disclose Citi's holdings in Century's and its affiliates' stock.

61. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "UCP's Reasons for the Merger; Recommendation of the UCP Board of Directors"; (iii) "Interests of Certain UCP Directors and Officers in the Merger"; and (iv) "Opinion of UCP's Financial Advisor."

62. Third, the Registration Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

63. For example, the Registration Statement fails to disclose the terms and value of the indications of interest and proposals received by the Company in 2015.

64. Additionally, while the Registration Statement provides that, on April 7, 2017, "Party F" submitted a proposal to acquire UCP in an all-cash transaction for $14.29 to $16.67 per share of UCP Class A common stock—materially higher than the merger consideration—the Registration Statement fails to disclose the nature and timing of Citi's subsequent discussion with Party F regarding the proposal as well as whether there were any subsequent communications between Party F and UCP or its representatives.

65. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; and (ii) "UCP's Reasons for the Merger; Recommendation of the UCP Board of Directors."

66. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to UCP's stockholders.

**COUNT I**

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and UCP**

67. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

68. The Individual Defendants disseminated the false and misleading Registration

Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. UCP is liable as the issuer of these statements.

69. The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

70. The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

71. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

72. The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

73. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

74. Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and Century

75. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76. The Individual Defendants and Century acted as controlling persons of UCP within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their

positions as officers and/or directors of UCP and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

77. Each of the Individual Defendants and Century was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

78. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

79. Century also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

80. By virtue of the foregoing, the Individual Defendants and Century violated Section 20(a) of the 1934 Act.

81. As set forth above, the Individual Defendants and Century had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 10, 2017

**LEVI & KORSINSKY LLP**

By: */s/ Rosemary M. Rivas*

Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long (to be admitted *pro hac vice*)
Gina M. Serra (to be admitted *pro hac vice*)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone: (302) 295-5310
Facsimile: (302) 654-7530

## CERTIFICATION OF PLAINTIFF

I, Joseph Tola ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, and I will testify at deposition or trial, if necessary. I understand that this is not a claim form and that I do not need to execute this Certification to share in any recovery as a member of the class.

4. Plaintiff's purchase and sale transactions in the UCP, Inc. (NYSE: UCP) security that is the subject of this action during the class period is/are as follows:

**PURCHASES**

| Buy Date | Shares | Price per Share |
|---|---|---|
| 11/11/13 | 100 | $13.75 |
| | | |
| | | |
| | | |

**SALES**

| Sell Date | Shares | Price per Share |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

***Please list additional transactions on separate sheet of paper, if necessary.***

5. Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6. During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May, 2017.

JOSEPH TOLA